

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

HELEN TATE, as Personal
Representative of the Estate of
DEQUON DEPREE LaFAYETTE,
Deceased,

       Plaintiff,

v.

BLAINE LAFLER, Warden;
MARK RICHARD, Corrections Officer;
CURTIS JOHNSON, Corrections Officer;
LINDA BOCK, Corrections Officer;
and WILLIAM FOY, Captain;

       Defendants.

/

CASE NO. 03-CV-10263-BC

DISTRICT JUDGE DAVID M. LAWSON
MAGISTRATE JUDGE CHARLES BINDER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON DEFENDANTS' RULE 56(b) MOTION FOR SUMMARY JUDGMENT
(Dkt. 16)

## I.  RECOMMENDATION

**IT IS RECOMMENDED** that, for the reasons set forth below, Defendants' Rule

56(b) Motion for Summary Judgment be **GRANTED.**

## II.  REPORT

### A.  Introduction

Pending, pursuant to an Order of Reference from United States District Judge David

Lawson for all pretrial proceedings (Dkt. 2), is the above-entitled motion.  Plaintiff has filed

a response opposing the motion (Dkt. 18), and Defendant has filed a reply. (Dkt. 31.) Oral argument was held on May 18, 2004, at which time Plaintiff was directed to produce additional medical records for review. Counsel for Plaintiff promptly complied, and this matter is now ready for Report and Recommendation.

## B.   Background

Plaintiff's decedent, DeQuon Depree LaFayette (hereinafter "LaFayette"), was, at the time of his death, 18 years of age and in the custody of the Michigan Department of Corrections (hereinafter "MDOC") at the Saginaw Regional Correctional Facility.[1] LaFayette's personal representative filed a two-count complaint on October 22, 2003, naming the warden of that institution and three corrections officers as defendants. The complaint, filed pursuant to 42 U.S.C. § 1983, alleges that on April 11 and 12, 2002, Defendants were deliberately indifferent to LaFayette's serious medical needs in violation of his Eighth and Fourteenth Amendment rights.

The complaint asserts that during the evening hours of April 11 and the early morning hours of April 12, 2002, LaFayette's medical condition rapidly deteriorated, so that by 7:35 a.m. on April 12, LaFayette was found in his cell unresponsive, lethargic and disoriented. (Compl., Dkt. 1, ¶¶ 16-19.) LaFayette was subsequently transported to Covenant Hospital

---

[1]Information available on the Internet indicates that LaFayette was serving a 2-10 year sentence for assault with intent to commit great bodily harm less than murder and a two-year sentence for felony firearm handed down by the Calhoun County Circuit Court in October 2001.

in Saginaw where he died ten days later of anoxic[2] encephalopathy[3] with brain edema,[4] diffuse encephalopathy and bronchopneumonia.[5]   (*Id.* at ¶ 20.)   Plaintiff's allegations of constitutional deprivations focus on the treatment accorded LaFayette by Defendants between approximately 10:00 p.m. on April 11 and 7:00 a.m. on April 12.  None of the physicians or staff members of Covenant Hospital are named as defendants.  Nor are any of the first shift correctional officers or medical personnel who saw, treated, assisted, and escorted LaFayette to the hospital early on the morning of April 12 named as defendants.

## C.   Defendants' Motion for Summary Judgment

### 1.   Arguments of the Parties

Defendants argue that their actions do not constitute cruel and unusual punishment as this term has come to be defined by the federal courts, and particularly the United States Supreme Court.  Defendants point to the fact that MDOC policy does not provide for on-site medical personnel at the Saginaw Correctional Facility between the hours of midnight and

---

[2]Anoxic is defined as "the abnormal condition in which the oxygen content of the cells and the tissues of the body is below normal; having less than the normal amount of oxygen in the cells or tissues of the body; marked by a lack of oxygen, anywhere."  1 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE A-397.

[3]Encephalopathy is a "disease of the brain, especially a chronic degenerative disease."  2 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE E-87.

[4]Edema is "a swollen or puffed up condition of tissues due to excessive accumulation of fluids in the tissue spaces, generally in the spaces between the cells."  2 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE E-25.

[5]Bronchopneumonia is "an inflammation of the lung which begins in the bronchioles, the smaller divisions of the tubes which carry air from the windpipe (trachea) to the lung tissue.  The lung tissue, composed of sponge-like air spaces, becomes clogged with fluid, and the inflammation spreads from one spot to another in a patchy pattern."  1 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE B-210.

7:00 a.m. Defendants thus argue that they are entitled to qualified immunity. Attached to the instant motion are affidavits from each Defendant, as well as critical incident reports.

Plaintiff disputes the legal interpretation given to the events surrounding LaFayette's death, pointing, among other things, to deposition testimony of other prisoners. Plaintiff maintains that the instant motion is premature and that significant disputed issues of material fact remain which require at the very least additional discovery, and in the alternative, trial by jury. Plaintiff places particular emphasis upon the depositions of three prisoner witnesses.[6]

Defendants' reply reiterates the arguments previously made. Attached to the reply are prison medical records, the autopsy report, and an opinion authored by U. S. District Judge Victoria Roberts granting summary judgment for defendants in the case of *Estate of Charles Smith v. Lintz*, No. 02-70121 (E.D. Mich. April 22, 2004).

### 2.   Governing Law and Motion Standards

A prisoner civil rights claim brought under 42 U.S.C. § 1983 requires proof of two essential elements: (1) the defendant was a person acting under the color of state law; and (2) the defendant deprived the prisoner of rights, privileges, or immunities secured by the Constitution or laws of the United States of America. *Street v. Corrections Corp. of America*, 102 F.3d 810, 814 (6th Cir. 1996). Both elements must be satisfied as to each defendant. *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991). A plaintiff must also

---

[6]Pursuant to an order allowing deposition of prisoners (Dkt. 21), counsel for Plaintiff was granted leave to take discovery depositions of these three prisoners.

sufficiently allege the personal involvement of each defendant. *Street*, 102 F.3d at 817-18; *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982).

A motion for summary judgment will be granted where there is no genuine issue of material facts, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The moving party bears a considerable burden. The Court of Appeals for the Sixth Circuit has held that a

> District Court may grant a motion for summary judgment only if it finds from the whole record before it that there are no material facts which are in dispute. It may not make findings of disputed facts on a motion for summary judgment. The movant has the burden of showing conclusively that there exists no genuine issue as to a material fact and that the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion. The movant's papers are to be closely scrutinized while those of the opponent are to be viewed indulgently.

*Watkins v. Northwestern Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1158 (6th Cir. 1980) (citations omitted). *See also Ghandi v. Police Dep't of Detroit*, 747 F.2d 338 (6th Cir. 1984).

Summary judgment is proper when the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326. However, to defeat the motion, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 191 L. Ed. 2d 202 (1986). It is the

plaintiff's obligation to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Celotex*, 477 U.S. at 324.

Not every issue of fact or conflicting inference presents a genuine issue of material fact requiring the denial of summary judgment. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Irrelevant and unnecessary facts should have no bearing on a trial court's determination on a motion for summary judgment. *Id.* at 248. Accordingly, only germane facts that go to the heart of the party's suit deserve consideration. The courts will not entertain metaphysical doubts as material facts to defeat the motion. *Matsushita*, 475 U.S. at 586.

### 3. Record Evidence of the Events Leading up to LaFayette's Death

All parties agree that LaFayette's medical condition rapidly deteriorated between approximately 10:00 p.m. on April 11 and 7:00 a.m. on April 12, 2002. All parties further agree that LaFayette exhibited no medically significant symptoms throughout most of the day on April 11. In fact, during oral argument, counsel for Plaintiff stated that LaFayette played basketball with other prisoners that evening.

### a. Prisoner Michael Palmore's Deposition Testimony

Michael Palmore testified at his deposition that he first met LaFayette when they were housed together at another institution. (Palmore Dep., Dkt. 26 at 9.) They were transferred to the Saginaw facility at the same time, and were both assigned to the 800 unit, which apparently is designated for prisoners of their age group. (*Id.* at 14-15.) Palmore testified

6

that he was housed in the room next to LaFayette (*id.* at 24), and that he and LaFayette frequently ate their meals together. (*Id.* at 39-40.) During their time at the Saginaw prison, Palmore did not see LaFayette frequently go to the medical facility, nor was he aware that LaFayette had any particular medical problems. (*Id.* at 44.) Palmore testified that LaFayette attended school classes with him on April 11, 2002, and they also went to dinner together that evening. (*Id.* at 50-52.) After dinner, while Palmore was braiding LaFayette's hair, LaFayette said to him, "Man, I got a little, small headache, and I'm probably going to go in the room and sleep it off." (*Id.* at 53.) They agreed that Palmore could finish the process later. Approximately 20 minutes later, LaFayette returned to the outdoor yard, and Palmore finished braiding his hair. (*Id.* at 54-55.)

Palmore testified that sometime after the outdoor yard closed, approximately 7 to 8 p.m., LaFayette went to corrections officers, described his condition, and "they walked him off to healthcare." (*Id.* at 57.) Subsequent to a routine count of inmates which took place at approximately 9:30 or 10:00 p.m., LaFayette came to Palmore and asked him to dial a phone number. (*Id.* at 60-61.) According to Palmore, LaFayette wished to talk to family members. Palmore stated that this drew the attention of corrections officers, who stated it was a violation of rules and threatened them with misconduct tickets. (*Id.* at 61-62.) Palmore testified that LaFayette's gait at that time appeared unsteady, and his eyes were less than fully open. (*Id.* at 68.)

Palmore recounted that, after midnight inmate count, another inmate told him that LaFayette had become "sick as hell . . .," and appeared nauseous. (*Id.* at 63-64.) Palmore

7

went to visit LaFayette in his room and found him lying on a top bunk "curled up . . ., like he was shivering cold or something." (*Id.* at 71.) At some point during the visit, Palmore describes LaFayette as sitting up in bed. (*Id.* at 72.) Palmore stated that later in the night, corrections officers came by LaFayette's room to check on him. (*Id.* at 73-74.) Palmore testified that he could hear these exchanges from his bunk in an adjoining room. (*Id.* at 74.)

In the morning hours, at approximately 7:00 a.m., Palmore heard morning shift guards say that LaFayette had seizures and had lost bladder control. (*Id.* at 75.) At some point, Palmore left his room and looked into LaFayette's room. Palmore said he saw LaFayette lying on the floor, and that the top bunk that he had been on "looked a little wet . . . but most of it had – I guess had dried up." (*Id.* at 76.) Palmore stated he tried to get LaFayette to talk without success. (*Id.* at 76-77.) At that point, he left the room and saw medical personnel, along with equipment, come down the hall and enter the room. Corrections officers told all the inmates to stay where they were. (*Id.* at 77.) Palmore stated that he saw corrections officers remove LaFayette into the hallway. Standing in his doorway, Palmore testified that he could see that LaFayette's arms were straight down at his sides and that he was not responsive. (*Id.* at 78-79.) It appeared to Palmore that LaFayette was trying to resist the efforts of the medical personnel and corrections officers, who pushed LaFayette back to the floor and restrained him in cuffs, lifted him onto a stretcher and removed him to an ambulance. (*Id.* at 80-81.) Palmore stated that "I guess he start [sic] having a seizure or something[.]" (*Id.* at 82.)

8

During cross-examination by the assistant attorney general, the following exchange

took place:

Q.  You said earlier that, around midnight or close to when you're about to fall asleep, that you thought that LaFayette was going to be okay 'til the morning?

A.  Yup.

Q.  Why did you think that?

A.  Because I'm, like – you know, nothing like this never happened before. So I figured, a headache, you know – and, you know, he probably threw up a little bit – all you got to do is sleep it off.  He'll be all right, you know.  And that's what – a couple guys upstairs, we was talking about it: "He probably – he'll be all right.  He'll be all right in the morning."  So we thinking not too much big about it, you know.   But it went into something big and, you know, I never thought nothing like that was going to happen.

Q.  You're saying that it was, I guess, a surprise to you that –

A.  Yeah.

Q.  – he went down that quickly?

A.  Yeah.

(*Id.* 94-95.)

### b.   Prisoner Lee Dobine's Deposition Testimony

Prisoner Lee Dobine also gave deposition testimony.  He stated that he had become

acquainted with LaFayette through mutual friends.   (Dobine Dep., Dkt. 27 at 6-7.)

According to Dobine, after he and LaFayette had dinner together on April 11, 2002, they

went to the day room "as usual" to watch T.V. and converse with other inmates. (*Id.* at 18.)

After the 9 p.m. inmate count, Dobine testified that he saw LaFayette again, who was at this

9

time complaining of dizziness and lightheadedness. (*Id.* at 20-21.) Dobine testified that LaFayette's gait appeared to be staggering, and he encouraged LaFayette to ask for a consultation with Health Care. (*Id.* at 21-22.) Dobine estimates that LaFayette went to Health Care sometime between 9:30 and 10 p.m. (*Id.* at 22-23.) Dobine testified that LaFayette's symptoms appeared to persist. (*Id.* at 24.) Dobine testified that he did not see LaFayette after the midnight inmate count on April 11.

Attached to Dobine's deposition are written statements. (Dkt. 27, Exs. 1-3.) Substantial portions of the statements were read into the deposition. (Dkt. 27 at 13-16.) Dobine testified that the source for much of the information in those written statements was LaFayette's roommate and the inmate housed in the next room, Michael Palmore. (*Id.* at 28-29.) Dobine testified that prior to April 11, LaFayette appeared to be healthy and enjoyed playing basketball. (*Id.* at 32.) Dobine also testified that prior to that time, LaFayette had never complained of symptoms such as those he exhibited that day. (*Id.* at 32.)

### c.   Prisoner Earl Smith's Deposition Testimony

LaFayette's cellmate, Earl Smith, was also deposed. He testified that he first became acquainted with LaFayette when they were processed together at the Riverside Correctional Facility. (Smith Dep., Dkt. 28 at 5-6.) Smith testified that LaFayette enjoyed playing basketball. (*Id.* at 7.) Smith stated that, prior to April 11, he did not notice anything unusual about LaFayette's health or hear any complaints of headaches. (*Id.* at 8-9.) Smith testified that on that day he was in "top lock," in other words, confined to his room. (*Id.* at 15.)

10

On the evening of April 11, Smith ate dinner with LaFayette and evidenced no problems. (*Id.* at 18.) Smith testified that after returning from dinner, LaFayette and Palmore went out to a yard outside the building to braid LaFayette's hair, and upon his return, LaFayette complained of a headache and stated that he wasn't feeling well. (*Id.* at 18-19.) Smith recounted his understanding of LaFayette's consultation with health services. (*Id.* at 19-22.) Smith said that after LaFayette returned from seeing the nurse, LaFayette got in his upper bunk to go to sleep but was acting in a fitful manner. (*Id.* at 23-24.) LaFayette sometime later exited the bunk with some difficulty. Smith testified that LaFayette told him that he was "a little dizzy." (*Id.* at 23-24.) According to Smith, LaFayette then went to the bathroom and returned. Smith did not believe that LaFayette was experiencing nausea at that time. (*Id.*) According to Smith, after his return, LaFayette endeavored to climb into his upper bunk and was unable to do so. (*Id.* at 25.)

Smith believed that LaFayette's speech was somewhat slurred. LaFayette tried more than once to climb into the bunk without success and left to go to the bathroom. Smith testified that he heard a sound which he believed was LaFayette collapsing in the hallway. (*Id.*) Both Smith and prison guards came to assist. (*Id.* at 27.) Smith recalls that corrections officers assisted LaFayette to the bathroom and testified that LaFayette, upon returning from the bathroom, had vomit on his front. (*Id.* at 28-29.) LaFayette continued to have problems getting up to his bunk, and Smith left the room and reported this to officers. (*Id.* at 30-31.) Officers apparently accompanied Smith back to the room and informed Smith to trade bunks with LaFayette. (*Id.* at 31.) Smith testified that LaFayette got off the bunk and laid on the

11

floor. (*Id.*) He appeared to be curled up and quivering. (*Id.* at 32.) According to Smith, at some point LaFayette again became nauseous. (*Id.* at 32-33.)

Smith testified that he reported LaFayette's condition to officers on four or five occasions over the night. (*Id.*) Smith said he was given a bucket and a cloth, even though he was not a "porter," and was told to return to the room and "clean it up." (*Id.* at 33.) On another occasion, officers came to the room and helped to return LaFayette to his bunk. (*Id.* at 34.) Subsequently, according to Smith, LaFayette again left the bunk and laid on the floor, and Smith believed that while on the bunk, LaFayette had urinated. (*Id.* at 34-35.) Smith testified that he reported this to officers who reminded him that there were no health services at that hour. (*Id.* at 35.) Smith testified that at some point the quivering "slowed down," but he believed something still was not right because "I could see it in his eyes. Like his eyes were looking like lazy now like they were rolling back[.]" (*Id.* at 36.) Smith testified that LaFayette appeared to be making attempts to speak but without success. (*Id.* at 36-37.)

Smith testified that he became seriously concerned for LaFayette's well being. He stated that there were no subsequent incidents of vomiting and that LaFayette was "just lying there, motionless now." In the morning, Smith alerted the 6 a.m. incoming shift of LaFayette's condition and was told by corrections officers that Health Care would be notified. Smith testified that Health Care had not arrived by 7 a.m., when rooms were routinely checked by corrections officers. (*Id.* at 38-39.) Sometime after 7 a.m., Smith again approached corrections officers expressing his concern for LaFayette's condition. (*Id.* at 39-40.) At some subsequent point, Smith was escorted out of the room, an ambulance

12

arrived, and LaFayette was removed. (*Id.* at 33-34.) Smith testified that he heard from another inmate that a Health Care nurse stated that she was unaware that LaFayette may have been allergic to aspirin. (*Id.* at 54.) According to Smith, "[t]hat explained to me the whole incident of what happened."

### d.   Defendant Captain William Foy's Affidavit

Defendant Captain William Foy states in his affidavit that at 10:48 p.m. on April 11, LaFayette told corrections officers in Unit 800 that he was not feeling well. (Foy Aff., Dkt. 16, Ex. 2, ¶ 3.) The officers called Health Care, and LaFayette spoke with the on-duty nurse. Following the call, LaFayette was escorted to Health Care. He returned to his cell approximately 20 minutes later. (*Id.*)

Defendant Foy states that "early in the morning" of April 12, LaFayette was found lying in the hallway outside his cell. (*Id.* ¶ 4.) Foy and Corrections Officer Richard Johnson, also named as a defendant, responded. According to Foy, LaFayette was "conscious and responsive, complaining of flu-like symptoms. We helped LaFayette back to his room." (*Id.*) Foy asked LaFayette a series of questions concerning his condition so that he could fill out a Health Care Contact Worksheet. Foy states that at approximately 2:00 a.m., with the form in hand, he contacted the Duane Waters Hospital, also operated by the MDOC. According to Foy, "I was instructed to have prisoner LaFayette see Health Care in the morning at 0600 hours when staff arrives." (*Id.* ¶ 6.) Foy then instructed other officers to switch LaFayette to a bottom bunk (frequently considered a privilege by prisoners) because LaFayette was "claiming dizziness." Foy also "instructed officers that LaFayette would not

be going to the hospital but that he would see Health Care in the morning per Duane Waters Hospital." (*Id.* ¶ 7.)

Foy next states that at 5:00 a.m. officers called and reported that LaFayette was doing no better. Foy states that he instructed them to inform the incoming shift personnel. Foy himself also "passed on the information concerning prisoner LaFayette to Health Care and to First Shift." (*Id.* ¶ 8.) Foy states that at no time did he deny LaFayette health care, nor was he "aware that LaFayette's condition was sufficiently serious that he could not wait until Health Care arrived at 0600 (6:00 a.m.) hours." (*Id.*)

### e. Defendant Officer Bock's Affidavit

Defendant Corrections Officer Linda Bock states in her affidavit that at approximately 10:40 p.m. on April 11, Lafayette approached her at the desk in Housing Unit 800 complaining that he felt "funny." (Bock Aff., Dkt. 16, Ex. 3, ¶ 3.) When asked to be more specific, he is said to have recounted, "I don't know, I just feel funny." (*Id.*) After further questioning, LaFayette said, "I guess I feel kind of light-headed and dizzy." (*Id.*) Bock then called Health Care, and a nurse spoke to LaFayette. At approximately 10:48 p.m., he was escorted to Health Care and returned 19 minutes later. When Bock asked him what had happened, LaFayette responded that he must just have the flu and that he was given medication by the nurse and told to rest. (*Id.* ¶ 4.)

Bock states that over the next 40 minutes, LaFayette left his cell "a few times." She recounts that he was able to walk up and down the hallway and visit other inmates in the day room. Between midnight and 1:52 a.m., LaFayette was checked at 30 minute intervals, and

14

Bock recounts nothing unusual. Bock then states that at 1:52 a.m., LaFayette walked out of his room and laid on the floor in the hallway. Bock described Captain Foy's encounter with LaFayette, who, according to Bock, "remained conscious and responsive." (*Id.* ¶ 7.) Bock then describes Foy's telephone call to Duane Waters Hospital which "was standard procedure since Health Care staff went off duty at [midnight]. Health Care staff did not come back on duty until [6 a.m.]." (*Id.*) Shortly after 2:00 a.m., according to Bock, Captain Foy instructed that LaFayette would remain at the Saginaw Correctional Facility until he could be seen by Health Care in the morning. Bock recounts that, "[c]oncerned for his safety, Captain Foy also moved him to a bottom bunk so he wouldn't have to crawl up to the top bunk." (*Id.* ¶ 8.) Bock went off shift approximately 35 minutes later. Her affidavit states that at no time that night was LaFayette locked in his cell, nor did she witness him coughing, wheezing, vomiting, sneezing or becoming otherwise unresponsive. (*Id.* ¶¶ 9 & 10.)

### f.     Defendant Officer Richard's Affidavit

In his affidavit, Defendant Corrections Officer Mark Richard also recounts LaFayette's trip to Health Care in the late evening hours of April 11, 2002. (Richard Aff., Dkt. 16, Ex. 4 ¶ 3.) Richard states that prior to midnight, "Lafayette was seen in the dayrooms interacting with other prisoners." (*Id.* ¶ 4.) Richard also recounts the incident where LaFayette was seen lying on the floor and Captain Foy's instruction to return him to his room and assign him a lower bunk. Richard states that "Lafayette was checked on every subsequent round and also several times between rounds. We also spoke with inmate Smith while he was awake to inquire if he noticed any changes in LaFayette." (*Id.* ¶ 6.) Richard

15

recounts that at approximately 5:00 a.m., Lafayette was again found sleeping on the floor, this time in his room. LaFayette told Officer Richard that he felt warm and that it felt cooler on the floor. Richard helped LaFayette back into bed and reported the incident to Captain Foy who stated that "LaFayette would be seen by Health Care as soon as first shift came in." (*Id.* ¶ 7.) Richard states that "[a]lthough LaFayette appeared to be not feeling well, I was never aware that LaFayette had a serious medical condition." (*Id.* ¶ 8.) At 6:00 a.m., at the end of his shift, Richard left the facility.

### g.   Defendant Officer Johnson's Affidavit

Defendant Corrections Officer Curtis Johnson's affidavit is in many ways similar to those of the other Defendants with regard to the incidents of 10:48 p.m., as well as Captain Foy's encounter with LaFayette at 1:52 a.m. (Johnson Aff., Dkt. 16, Ex. 5.) Johnson recounts that prior to the midnight count of inmates, ". . . I noticed him in the Quiet Room. During this time, Lafayette looked and acted as if he was doing well and had no obvious signs of illness. LaFayette returned to his cell before count time at [midnight]." (*Id.* ¶ 4.) Johnson also states that at no time did he see LaFayette coughing, sneezing, vomiting or in an unresponsive state. (*Id.* ¶ 9.) Johnson states that information concerning LaFayette was passed on to the incoming first shift staff. (*Id.* at ¶ 8.)

### h.   MDOC Medical Records

Attached to Defendants' reply brief are MDOC medical records for LaFayette that cover the period at issue. These include the contact LaFayette had with medical staff the night of April 11, as recounted by the Defendants. According to the entry made by the

16

registered nurse who saw LaFayette at 11:00 p.m. on April 11, he was complaining of "headache, dizziness, since 12 p.m." (Defs.' Reply, Dkt. 31 at Ex. 1.) LaFayette told the nurse that he "went to lunch and dinner [with] difficulty." (*Id.*) LaFayette is said to have denied nausea or vomiting at that time. The nurse reported that LaFayette's hand grips were normal, and she saw no signs of neurological deficits. Plaintiff's blood sugar, blood pressure and vital signs were taken. She also noted that LaFayette appeared to walk with difficulty. Tylenol was given to him, along with instructions that he contact Health Care if his symptoms persisted. (*Id.*)

An entry appearing in LaFayette's MDOC medical records dated April 12, 2002, signed by Dr. Aldabagh, notes that LaFayette had a headache which was "followed by vomiting and recurrent seizures." (*Id.*) Dr. Aldabagh also noted that LaFayette was not responsive and lacked bladder control. According to Dr. Aldabagh, LaFayette showed "generalized muscle stiffness" and was sent to the ER in an unresponsive state.

Also attached to Defendants' reply brief is the Health Care Contact Worksheet mentioned by Captain Foy in his affidavit. (Dkt. 31 at Ex. 1.) Over Captain Foy's signature, the type of concern listed is "flu-like symptoms, shivering, throwing up, dizziness." (*Id.*) Captain Foy notes that this condition had persisted for "about a day" and that LaFayette complained of "mild, constent [sic]" pain. Captain Foy also noted "nausea, vomiting, [and] dizziness[.]" Captain Foy made notations that he contacted Duane Waters Hospital with this information and, as he stated in his affidavit, was instructed to arrange for LaFayette to see

17

Health Care the next morning. (*Id.*) Foy also noted his changing of LaFayette's bunk assignment "due to dizziness[.]"

Another document provided is a "Notice of Emergency Department (ED) Visit," also authored by Dr. Aldabagh. It states that at the time LaFayette was transported from the correctional facility, he had "acute onset seizures[,] [and was] unresponsive to name call." (Defs.' Reply Br., Dkt. 31 at Ex. 1.) It also states that LaFayette was "reportedly vomiting throughout night. Skin warm and dry. No loss of bowel or bladder[.] Roomate [sic] reports inmate taking Tylenol last night." (*Id.*)

### i.   MDOC Log Sheets

MDOC log sheets indicate an entry made at 11 p.m. on April 11, stating, "Rounds made. Inmate LaFayette complaining of dizziness. Jim notified and spoke to inmate." An entry made 42 minutes later states: ". . . LaFayette out to HC health services under escort." (Smith Dep., Dkt. 28 at 42.) Log sheets indicate an entry at 1:52 a.m. "At 0152 inmate LaFayette from 8157 is lying on the floor in C-wing hallway." (*Id.* at 43.) The entry continues, "Officer Richard, Officer Johnson, and Cap. Foy responding." (*Id.*) A log sheet entry at approximately 1:55 a.m., "LaFayette is conscious, responding, complaining of flu-like symptoms, weakness. Captain Foy telephone CK for status." (*Id.* at 44.) An entry approximately ten minutes later includes the statement that "Lafayette will not be going on an outside now per Diane Waters. He will be seen by health care in the morning." (*Id.* at 44-45.)[7] Log sheets discussed during the Smith deposition confirm that instructions were noted

---

[7]The reference to "Diane" Waters obviously should say "Duane" Waters, the MDOC prison hospital located in Jackson, Michigan.

18

that Lafayette was to see Health Care in the morning and that his roommate, inmate Smith, was transferred to the other bunk in the room. (*Id.* at 45.)

Other log sheets discussed during the Smith deposition indicate an entry made at 5 a.m., as follows: "At 0500 rounds made. Inmate LaFayette still not doing well. Back on the floor. CO [Corrections Officer] Richard put him back in bed. CC and Captain Foy notified. . .,"along with an entry on April 12, 2002, between 7:35 and 7:38 a.m., relating to LaFayette's removal by ambulance from the facility. (*Id.*)

### j.    MDOC Critical Incident Reports

Critical incident reports filed by first shift corrections officers not named as defendants describe developments the next morning.   One of the reports, completed by a Sergeant Yell, states that at approximately 7:30 a.m. on April 12, the resident unit officer found LaFayette "lying on his cell floor unresponsive." (Dkt. 16, Ex. 6 at 1.) Health Care was notified, as well as a corrections sergeant, and three nurses responded within five minutes. Apparently, Health Care staff initially suspected that LaFayette was suffering from seizures. According to the Critical Incident Report, the on-call physician, Dr. Aldabagh, arrived approximately five minutes later. During this time, an ambulance was requested and the warden notified. At 8:25 a.m., LaFayette was taken by ambulance to Covenant Hospital in Saginaw. Sgt. Yell's Critical Incident Report states that "Prisoner LaFayette was resistant to medical staff and treatment. Soft restraints were applied . . . to aid in treatment. The restraints were removed after [LaFayette] was sedated by medical staff. [LaFayette] was admitted to the hospital for observation at approximately [noon]." (*Id.*)

19

### k.   Covenant Hospital Medical Records

Pursuant to  my directive at the end of the motion hearing, medical records of the hospitalization were also produced.   The Discharge Summary provides additional information as to LaFayette's condition at and shortly before the time he was admitted to Covenant Hospital.  According to the summary, LaFayette came to the hospital "with a headache, vomiting and tonic[8] movements."  (Discharge Summary, Dkt. 32 (filed under seal).)  The summary states that LaFayette complained of headache and dizziness the night before and was seen by the prison medical officer.  It goes on to explain that "[s]ubsequently, he was sent back to his cell.  He took . . . Tylenol in the evening and was noticed to have vomiting [sic] several times during the night.  In the morning, he was noticed by one of the staff at the prison to be drowsy and noted to be rigid, and there was short periods where he was noted to become extremely rigid with tonic posture and was found to have been in a post-ictal state."  (*Id.*)  According to the discharge summary, this happened three times before "EMS was called, and the paramedics found him on the floor, not responding to vocal stimuli, but he responded to ammonia by shaking his head and it was very difficult to arouse him."  (*Id.*)

The Discharge Summary also states that a CT scan of LaFayette's head was negative, and that a lumbar puncture was performed which showed no evidence of infection, but the presence of "RBC."  (*Id.*)  At the time of his admission, the physician reported that LaFayette was "drowsy" and was in restraints.  "No verbal responses obtained. . . ."  The physician

---

[8]Tonic means "characterized by a sustained contraction; marked by continuous tension, as a tonic spasm."  6 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE T-155

20

noted no history of past seizure activity. LaFayette was transferred to the Intensive Care

Unit, and, as mentioned, died approximately ten days later due to anoxic encephalopathy,

which resulted in brain death.

## 4. Analysis and Conclusions

### a. Qualified Immunity

Defendants move for summary judgment on the basis of qualified immunity. The U.S.

Supreme Court has explained that, pursuant to the defense of qualified immunity,

"government officials performing discretionary functions generally are shielded from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

To determine whether an official is entitled to qualified immunity, the Sixth Circuit

has instructed that courts are to

> employ the sequential analysis prescribed by the Supreme Court in *Saucier v.*
> *Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). First (the
> court) must determine whether, taken in the light most favorable to the party
> asserting the injury, the facts alleged are sufficient to make out a violation of
> the Constitution. *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151. "If no
> constitutional right would have been violated were the allegations established,
> there is no necessity for further inquiries concerning qualified immunity." If,
> however, "a violation could be made out on a favorable view of the parties'
> submissions, the next, sequential step is to ask whether the right was clearly
> established." *Id.*

*Greene*, 310 F.3d at 894. "The relevant, dispositive inquiry in determining whether a right

is clearly established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

21

### b.    Eighth Amendment Claim

The gravamen of Plaintiff's complaint is the allegation that Defendants violated LaFayette's Eighth Amendment rights.  The Eighth Amendment to the U.S. Constitution protects convicted inmates from the imposition of "cruel and unusual punishments."  U.S. CONST. amend. VIII.  The Supreme Court held in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), that the deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment to the Constitution.  The Court explained that "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."  *Id.* at 106.

A violation of the Eighth Amendment can occur if it "is manifested by prison doctors and their response to prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  The inquiry is two-pronged, consisting of both an objective and a subjective element.  *Wilson v. Seiter*, 111 S. Ct. 2321, 2323, 115 L. Ed. 2d 271, 279 (1991).  The objective inquiry asks whether the deprivation was sufficiently serious.  *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992).  The *Caldwell* court found that the plaintiff-prisoner "did not suffer a serious deprivation because his injuries were not serious enough to require immediate medical attention."  *Id.*  The subjective component asks whether the officials acted

22

with a sufficiently culpable state of mind. *Id.* The plaintiff must show that the defendants'
conduct demonstrated a level of deliberateness "'tantamount to an intent to punish.'" *See
Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993) (quoting *Molton v. City of Cleveland*, 839
F.2d 240, 243 (6th Cir.1988)). In 1994, the Supreme Court further explained this element "by
equating it with criminal recklessness, which requires a subjective showing that the
defendant was aware of the risk of harm." *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir.
1995) (citing *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811
(1994)). In *Farmer*, the Court specified that for a government official to be deliberately
indifferent, he "must both be aware of facts from which the inference could be drawn that
a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511
U.S. at 837.

In this case, there can be no question that the objective element is met. Pursuant to
*Caldwell, supra,* the objective component is *not* met where the prisoner's medical condition
is "not serious enough to require immediate medical attention." *Caldwell*, 968 F.2d at 602.
Here, the evidence shows that LaFayette's condition during the night of April 11, 2002, was
undoubtedly serious enough to require a timely response.

Regarding the subjective component, the question is whether Defendants were
deliberately indifferent to Plaintiff's serious medical needs. Defendants claim that they were
not. In support of their position, Defendants cite an Opinion and Order authored by U. S.
District Judge Victoria Roberts granting summary judgment for defendants in the case of
*Estate of Charles Smith v. Lintz*, No. 02-70121 (E.D. Mich. April 22, 2204). (Defs.' Reply,

23

Dkt. 31 at Ex. 3.) In that case, plaintiff's decedent died while in the custody of the Michigan Department of Corrections at the Mound Correctional Facility. Plaintiff's decedent had been hospitalized at the Huron Valley Correctional Facility Infirmary and discharged three days earlier. This case is, I suggest, distinguishable, however, as plaintiff's decedent in *Smith* had pre-existing medical conditions, including diabetes, which were well known both to the medical staff and to the corrections officers of the facility where plaintiff's decedent was housed.

Much closer on point, I suggest, is *Howard v. Calhoun Co.*, 148 F. Supp. 2d 883 (W.D. Mich. 2001), a case decided by Judge McKeague. There, as in the instant case, plaintiff's decedent was young, 28 years of age. More importantly, as in the instant case, plaintiff's decedent "[o]stensibly . . . was a healthy young man. He had no significant prior medical history that would have suggested any need for caution, activity restriction or close observation." *Id.* at 886. In *Howard*, plaintiff's decedent collapsed without warning while reading a newspaper in the jail's "TV room." Despite efforts to resuscitate him, he was pronounced dead 40-45 minutes later of what was ultimately diagnosed as a heart attack.

As in the instant case, the plaintiff in *Howard* alleged violations of Eighth Amendment rights and argued that defendants failed to promptly respond to plaintiff's decedent's medical condition. More specifically, the plaintiff in *Howard* alleged that by failing to begin resuscitation efforts immediately, the jail guard on the scene, as well as other defendants, violated plaintiff's decedent's Eighth Amendment rights. *Id.* at 888-889. In *Howard*, defendant Deputy Butts, the only jail guard on the scene at the time of plaintiff's

24

decedent's distress, first attempted to clear other inmates out of the area and tried to order them to "lock down." Some of the other inmates apparently ignored Butts's orders. After dealing with the other prisoners, Butts then returned to his desk and called for assistance. Within 10 to 15 minutes, a second deputy arrived, and CPR was undertaken. Subsequently, a nurse arrived, and an ambulance was called. Id. at 889.

Defendants moved for summary judgment, arguing that the actions of the defendants, particularly Deputy Butts, did not constitute deliberate indifference to serious medical need in violation of the Eighth Amendment. Judge McKeague agreed, beginning his analysis with the observation by the Supreme Court that:

> "[T]he Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999), quoting *Hudson v. McMillian*, 503 U.S. 1, 20, 112 s. Ct. 995, 117 L. Ed. 2d 156 (1992). . . .

*Howard*, 148 F. Supp. 2d at 888.

Judge McKeague presumed that Plaintiff had met the objective component of this analysis. Turning to the subjective component of this analysis, and citing *Farmer*, Judge McKeague stated that "Plaintiff must show that [deputy] Butts knew that Howard [the decedent] faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it." (*Id.*) After analyzing the evidence before him, Judge McKeague concluded that Deputy Butts' actions were not violative of the decedent's Eighth Amendment constitutionally protected rights:

25

On the face of things, then, even according to Banks' account, Butts took three distinct, reasonable steps to help ensure Howard's well-being. He called for help; he attempted to clear the TV room (so that Howard would be freely accessible to medical assistance when it arrived); and, when his attempts to clear the day room failed, he kept well-meaning, but perhaps ill-qualified, inmates from touching Howard. This conduct does not bespeak a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970. It does not suggest that "unnecessary and wanton infliction of pain" which implicates the Eighth Amendment. *Id.* Nor does it indicate a "reckless disregard" for Howard's safety. *Id.* at 836, 114 S. Ct. 1970.

*Howard*, 148 F. Supp. 2d at 889.

I similarly suggest that, as to the subjective component of the Eighth Amendment claim, the result reached in *Howard* also obtains in the instant case. During the evening of April 11, when LaFayette informed officers that he did not feel well, he was promptly taken to Health Care and examined by a nurse. (Palmore Dep. at 57; Bock Aff., Ex. 3 at ¶ 3; Richard Dep., Ex. 4 at ¶ 3; MDOC Medical Records, Defs' Reply, Dkt. 31 at Ex. 1.) Later that evening, at least one defendant saw LaFayette in the "dayrooms interacting with other prisoners." (Richard Aff., Ex. 4 at ¶ 4.) When early the next morning, LaFayette was found lying in the hallway outside his cell, Captain Foy was contacted and then engaged LaFayette in a series of questions along with escorting him back to his room. (Foy Aff., Defs.' Mot. for Summ. J., Ex. 2 at ¶ 4.) Foy then undertook what has been described as "standard procedure since Healthcare went off duty at [midnight]." (Bock Aff., Ex. 3 at ¶ 7.) Foy placed a call to the Duane Waters Hospital for advice. In the process, he filled out a Health Care Contact Worksheet and used it to record both his impressions and the instructions he received from medical personnel at Duane Waters. (Dkt. 31 at Ex. 1.) Foy received instructions from Duane Waters' personnel and complied with them. He returned LaFayette

to his room, endeavored to insure his comfort, and transferred him to a bottom bunk. Subsequently, LaFayette's condition was checked on repeated occasions. (Richard Aff., Ex. 4 at ¶ 6.)

As in *Howard*, I suggest that Defendants' actions in this case constitute "distinct, reasonable steps to help insure [LaFayette's] well being." As did Judge McKeague in *Howard*, I suggest that these actions do not demonstrate an "unnecessary and wanton infliction of pain," nor do they indicate a "reckless disregard" for LaFayette's safety. Defendants did not refuse or neglect to care for LaFayette. Rather, on each occasion, when they either discovered or observed that LaFayette was not feeling well, they took action. When LaFayette first complained of symptoms, they took him to a nurse. When LaFayette was later seen lying on the floor, corrections officers called in a superior officer who in turn followed after-hours "standard procedure" and called for medical advice from an MDOC hospital. The superior officer followed that advice, acted to insure LaFayette's comfort, and directed corrections officers to check on LaFayette's condition on a regular basis, directives with which the corrections officers assigned complied.

As to the argument made by counsel for Plaintiff that Defendants should have taken more comprehensive medical action at an earlier stage, I suggest that Judge McKeague's findings in *Howard* apply with equal force to the instant case.

> Plaintiff's argument may be entirely correct--in retrospect. For purposes of plaintiff's deliberate indifference claim, however, the blameworthiness of Butts' conduct must be measured *in light of his subjective knowledge at the time of Howard's collapse*. Then, there was no reason to suspect that Howard, an apparently normal, healthy 28-year old, was experiencing a heart attack. Butts states that he knew Howard's condition was serious (i.e., he was "not

27

faking an injury"), but due to his shaking, suspected he was experiencing a seizure of some sort. Butts dep. p. 15. Banks' own testimony corroborates this impression. Banks dep. p. 13. Thus, there is no evidence suggesting that Butts *actually knew the specific nature of the risks to Howard's health and safety.*

*Howard*, 148 F. Supp. 2d at 889 (emphasis added).

As in *Howard*, I suggest that there is no evidence in this case to indicate that any of the defendants knew the specific nature of the risks to LaFayette's health and safety. Up until the evening of April 11, LaFayette looked "apparently normal." As mentioned, during oral argument, counsel for Plaintiff described that LaFayette had played basketball with other prisoners the day before these incidents took place. To laymen, such as these defendants, LaFayette reasonably appeared to exhibit "flu-like symptoms, shivering, throwing up, dizziness[,]" (Defs.' Reply, Dkt. 31 at Ex. 1.) I suggest that the Constitution does not presume that these Defendants could reasonably have understood that Plaintiff on that evening was suffering from the first stages of what matured into a fatal brain infection. I therefore suggest, as found by Judge McKeague in *Howard*, that the evidence, when viewed "in the light most favorable to plaintiff, but with due regard for the record as a whole, it is apparent that the evidence against [Defendants] does not even hint at a sufficiently culpable state of mind," but bespeaks, at worst, mere negligence. *Howard*, 148 F. Supp. 2d at 890.

### c.    Conclusion

Accordingly, because I find that from all the evidence presented no genuine issue has been created as to whether Defendants possessed the subjective intent to commit acts that would amount to an Eighth Amendment violation, I suggest that Defendants' motion for summary judgment be granted. Further, since I suggest that no deprivation of a constitutional

right occurred, "there is no claim under § 1983, and Defendants have no need for a qualified immunity defense." *Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999). *See also Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity"). Accordingly, there is no need to proceed to the second step of the qualified immunity analysis.

### d.    State Law Claims

Because I suggest that summary judgment be entered for Defendants on the federal claims, I further suggest that this Court not exercise its discretion to entertain the pendent state claims brought in Count II of the complaint. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) (noting that generally "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.")

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report

and Recommendation. *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th

Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.

1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon

this Magistrate Judge.

CHARLES E. BINDER
United States Magistrate Judge

DATED: August 17, 2004

Copies to:   Philip R. Sturtz, Sturtz & Sturtz, 608 S. Michigan, Saginaw, MI 48601
             Kevin R. Himebaugh, Michigan Department of Attorney General, P. O. Box 30217,
                Lansing, MI 48909-7717
             Honorable David M. Lawson, United States District Judge