UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HELEN TATE, as Personal Representative
of the Estate of DEQUON DEPREE
LaFAYETTE, Deceased,

               Plaintiff,          Civil No. 03-10263-BC
v.                                         Hon. David M. Lawson
                                                    Magistrate Judge Charles E. Binder

BLAINE LAFLER, MARK RICHARD,
CURTIS JOHNSON, LINDA BOCK, and
WILLIAM FOY,

               Defendants.
_____/

**ORDER ADOPTING REPORT AND RECOMMENDATION
OF MAGISTRATE JUDGE, OVERRULING OBJECTIONS,
GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, AND DISMISSING ACTION**

The plaintiff's decedent, DeQuon Depree LaFayette, died while in the custody of the Michigan Department of Corrections at the Saginaw Regional Correctional Facility at the age of eighteen years. The cause of death was anoxic encephalopathy, a complication of bronchopneumonia. The plaintiff's personal representative filed a two-count complaint on October 22, 2003 naming as defendants the warden of the correctional facility that housed the plaintiff and three corrections officers. The complaint alleges pursuant to 42 U.S.C. § 1983 that the defendants violated the decedent's Eighth and Fourteenth Amendment rights to be free of cruel and unusual punishment, they were grossly negligent, and they intentionally inflicted emotional distress. The defendants filed a motion for summary judgment, which was addressed by Magistrate Judge Charles E. Binder pursuant to an order of reference for general case management under 28 U.S.C. § 636(b). On August 17, 2004, the magistrate judge filed a report recommending that the motion be granted and the case dismissed. The magistrate judge suggested that the plaintiff failed to come forward

with evidence that created a fact issue on the subjective component of the deliberate indifference test that has been established by the Supreme Court for Eighth Amendment claims of the sort alleged by the plaintiff. The plaintiff filed timely objections to the recommendation, to which the defendants replied, and the matter is now before the Court for *de novo* review.

I.

The facts of the case are not complicated. According to the prison records and deposition transcripts submitted with the motion papers, it appears that the decedent, Dequon Depree LaFayette, progressed rather rapidly from healthy to critically ill in the span of less than twelve hours. He was taken from his room at prison to a hospital in Saginaw, Michigan in a comatose state, where he was kept alive on a ventilator for about ten days, and then he expired. The focus of the case is on the nine-hour period from approximately 10:40 p.m. on April 11, 2002 through 7:40 a.m. on April 12, 2002 at the Saginaw Regional Correctional facility, and the conduct of the decedent's jailors in response to his deteriorating medical condition.

The Michigan Department of Corrections housed LaFayette in the 800 unit of the Saginaw Correctional facility in Freeland, Michigan. LaFayette shared a level II security detention room with a windowed door and a bunk bed with Earl Smith. The facility permits prisoners to leave their rooms when they want, unless they are on restriction. Corrections officers monitor the inmates from a guard station at the entrance to the two-floored prison block. The guard station is located in the top floor, and LaFayette's detention room was located on the bottom floor.

Before he became ill on April 11, 2002, the plaintiff appeared to be a normal, healthy young man who rarely made visits to the prison's health care facilities. On the evening of April 11, 2002, LaFayette began feeling sick and complained of a headache. At approximately 10:40 p.m., he

reported to Officer Linda Bock, one of the defendants, that he felt "kind of light-headed and dizzy." Bock sent LaFayette to the prison Health Care Center after speaking to one of the nurses on duty. He was seen as 10:48 p.m. and returned nineteen minutes later. LaFayette reported to Bock that he probably had the flu, and a nurse prescribed some medication and told him to get rest. Defendant officers Mark Richard, Curtis Johnson, Linda Bock, and Captain William Foy monitored the prison block for the night. The officers conducted rounds throughout the shift every thirty minutes; they state that they paid LaFayette extra attention. Sometime around 2:00 a.m., the officers found the plaintiff lying in the hallway. Officers Foy, Richard, and Johnson helped the plaintiff back to bed. At that time, Captain Foy observed that LaFayette was conscious and responsive; he complained of flu-like symptoms. Foy had questioned LaFayette to obtain information for a Health Care Contact Worksheet, which Foy used to contact the Duane Waters Hospital at approximately 2:09 a.m.

      In the worksheet, Foy described LaFayette's chief complaint as "flu like symptom, shivering, throwing up, dizziness" and noted the prisoner's overall appearance as "alert, shivering." Defs.' Reply Br. in Supp. of Summ. J. Ex. 1, Health Care Contact Worksheet. The entirety of the work sheet follows, with Foy's handwriting indicated by italics:

    1. Type of concern/problem/injury (chief complaint)
        *flu like symptoms, shivering, throwing up, dizziness*

    2. Note the prisoner's overall appearance (i.e. is he alert, grimacing in pain, pale, sweating, shivering, etc.)
        *alert, shivering*

    3. Duration (length of concern/illness/injury). How long has this been going on and has he/she requested treatment.
        *illness about a day*

    4. If in pain, exact location of pain, degree of and quality of pain (i.e. sudden vs. gradual onset, severe vs. mild, sharp vs. dull, constant vs. intermittent, does pain

radiate?) Be careful not to lead the prisoner. Let him/her tell you where, how long, and what kind of pain they have.
    *mild, constant*

5. Are other symptoms associated (i.e. short of breath, nausea/vomiting, dizziness, fever, etc.)? What else is happening related to the medical problem, i.e. headache and seeing halo around lights, room moves vs. being dizzy.
    *nausea, vomiting, dizziness*

6. Ask the prisoner about pertinent medical history (i.e. history of high blood pressure, heart attack, asthma, diabetes, etc.)
    No Answer

7. What medications is he currently taking? How much? When did he take his last dose? Verify by label on the medication, if possible.
    *seen by health care at beginning of shift*

8. What medications is he allergic to? If the prisoner reports an allergy, what happens: hives, nausea, can't breathe?
    No Answer

9. Any precipitating or related factors (i.e. cell rush, prior disciplinary action, personal family problems).
    *none*

10. Ask prisoner if he was ever treated for the same problem previously. If yes, how was it treated? When?
    No Answer

Name of person giving instructions: *D W Hospital*

Instructions: *see Health Care in morning*

Action Taken: *change bunks for the night due to dizziness*

Date: *4/12/02*

Name of Person Calling for Assistance: *Capt. W Foy    0205 hrs*

Signature:  /s  *Capt. W Foy*

Defs.' Reply Br. in Supp. of Summ. J., Ex. 1, Health Care Contact Worksheet.

Hospital staff advised Foy "to have prisoner LaFayette see Health Care in the morning at 0600 hours when staff arrives"; Foy was not advised to send LaFayette immediately to the hospital. Defs.' Mot. Summ. J. Ex. 2, Foy Aff. at ¶ 6. Foy gave instructions to have the plaintiff finish the night in Smith's bed, the lower bunk. Officer Bock finished her shift and left the block at 2:55 a.m. The remaining officers continued their rounds. At 5:00 a.m., Officer Richard found LaFayette sleeping on the floor of his room. Officer Richard questioned LaFayette, who said that he felt warm and it was cooler on the floor. The shift of the three remaining officers changed at 6:00 a.m., at which time they informed their replacements of LaFayette's status. Earl Smith, LaFayette's roommate, approached the new shift of officers and expressed concern about LaFayette's condition. At 7:33, LaFayette was found unresponsive in his cell and medical assistance was requested. The incident report states that the responding health care providers "suspected seizure activity." Defs.' Mot. Summ. J. Ex. 6, Critical Incident Report (Apr. 12, 2002). A medical doctor arrived in 800 unit at approximately 7:40 a.m. LaFayette was taken by ambulance to Covenant Cooper Hospital. He resisted efforts to move him and was uncooperative, so the officers had to restrain him using soft restraints.

According to the hospital discharge summary, LaFayette arrived at the emergency room in restraints; he was drowsy and not verbally responsive. He was admitted to the intensive care unit; he developed acute respiratory failure and was placed in a ventilator. Seizure activity was suspected. LaFayette encountered multiple complications over the next ten days, including right lower lobe pneumonia, central nervous system symptoms, central diabetes insipidus, cerebral edema, and renal failure. He was pronounced brain dead after the appropriate testing protocol evoked

negative responses, and he was pronounced dead at 4:35 p.m. on April 22, 2002. According to the autopsy report, LaFayette died of anoxic encephalopathy due to bronchopneumonia.

II.

The magistrate judge properly observed that the Eighth Amendment prohibits cruel and unusual punishment, and it applies to the States through the Fourteenth Amendment. In the area of medical treatment, the Supreme Court has held that there is no Eighth Amendment violation unless "a prisoner . . . allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Sixth Circuit recognizes that "'deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eight Amendment's prohibition against cruel and unusual punishment." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Gamble*, 429 U.S. at 104).

A deliberate indifference claim in the context of the Eighth Amendment requires proof of both objective and subjective elements:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Ibid.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). *See also Jennings v. Al-Dabagh*, 275 F. Supp. 2d 863, 867 (E.D. Mich. 2003) (stating that "[a] claim that the Eighth Amendment has been violated by a prison official's deliberate indifference to a prisoner's adequate medical care has both an objective and a subjective component"). The objective component is satisfied by proof that "the medical need asserted is 'sufficiently serious.'" *Jennings*, 275 F. Supp. 2d at 867 (quoting *Farmer*,

511 U.S. at 834). The existence of a "sufficiently serious" medical need can be shown if the inmate can demonstrate that he or she "is incarcerated under conditions imposing a substantial risk of serious harm." *Miller*, 408 F.3d at 812 (internal quotes and citations omitted). In this case, the magistrate judge found that the plaintiff satisfied the objective requirement of the deliberate indifferent test, and the defendants do not dispute that finding.

The Sixth Circuit has stated that to satisfy the subjective component, a prison official must have a sufficiently culpable state of mind. The court explained in two recent cases that to establish deliberate indifference, the plaintiff must show that a prison official knew of and disregarded a substantial risk of serious harm to the inmate. In *Miller*, the court explained:

> Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. The prison official's state of mind must evince deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference. Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005) (internal citations omitted).

In *Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005), the court elaborated further:

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the detainee's] health and safety. This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments.

*Id.* at 312 (quoting *Watkins*, 273 F.3d at 686). *See also Jennings*, 275 F. Supp. 2d at 868 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (stating that to satisfy the subjective

component, the plaintiff must allege that "the official subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk")).

In this case, there is no direct evidence that the defendants drew inferences about the decedent's condition in a manner consistent with liability. None of the defendants have averred, for example, that they believed LaFayette to be in such extreme peril that he needed immediate transport to a medical facility and yet failed to act. Of course, it is incumbent upon the plaintiff opposing a motion for summary judgment to designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Napier v. Madison County, Ky.*, 238 F.3d 739, 741-42 (6th Cir. 2001). Nonetheless, the plaintiff can avoid summary judgment by demonstrating that the defendants had a sufficiently culpable state of mind (i.e., the subjective component) "based on a strong showing on the objective component." *Carter*, 408 F.3d at 313.

Examples of this latter proposition can be found in *Garretson v. City of Midison Heights*, 407 F.3d 789 (6th Cir. 2005), in which the court found deliberate indifference on the part of city police officers who were told by an in-custody plaintiff that she was a diabetic and needed insulin, but refused treatment in the face of that obvious medical need. In *Carter*, deliberate indifference was found when a jailor ignored an inmate's complaints of chest pain and shortness of breath and her statements that she had not taken her heart medication. The evidence that the defendant disregarded the classic symptoms of a heart attack and the plaintiff's cries that she needed to go to a hospital was

sufficient to support an inference that satisfied the subjective component. *Carter*, 408 F.3d at 312-13. In *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006), the defendants ignored the decedent's symptoms of mental illness and dehydration and instead allowed him to "languish[] in his cell for five days without the door being opened and apparently with the officers unable readily to see into his cell for part of the time." *Id.* at 289. The inmate died of dehydration, and the court found that the evidence presented a fact issue for trial "given the [defendants'] repeated interaction with [the decedent] and repeated opportunities to assess the seriousness of the situation." *Id.* at 290.

In this case, other inmates also were deposed and provided additional information about LaFayette's condition during the evening and night. That testimony was summarized by the magistrate judge. In her objections to the magistrate judge's report, the plaintiff points to the deposition of Earl Smith, the decedent's roommate, as furnishing information that creates a material fact question on the subjective element of her Eighth Amendment claim. The plaintiff highlights specific passages of Smith's testimony, which follow:

> A: He slowly starts to get up and I ask him – that's why I know something's wrong but I'm not sure what it is. So I ask him, like, "Are you okay?" And he's like, "Yeah. I'm all right." I'm like, "Okay." But he's like slurring it though. He's not saying it how we – like a regular person would say it or how we would usually say it. And so he tries again and he falls again. So on the third try or either third or fourth try he finally makes it up there but he can't sit still again, like he's moving around and shifting a lot. So he jumps down again and does the whole collapse thing again. So he gets up and he walks out. And when he walks out like, I'm thinking, "Okay. He's probably just about to go to the bathroom again. Probably like feeling sick or something." When he goes out I hear like a loud bang and I look and he's collapsed in the hallway.
>
> Q: This is the hallway that is observable from the guard station; is that correct?
>
> A: Yes.
> . . .
> Q: What did the two officers do to Mr. LaFayette at that point in time?

-9-

A: They helped him up and I think they helped him down to the bathroom. That's when he went down to the bathroom.

Q: Did he come back?

A: Yes, he came back.

Q: How did he come back, on his own or with the assistance of the officers?

A: He came back on his own.

Q: How was he walking?

A: Stumbling and he had – this is when he had the vomit on his shirt.

Q: So when he came back, he's, you say, stumbling. How can you describe that in laymen's terms or –

A: In laymen's terms, basically he was swinging, basically, back and forth like not walking in a straight line.

Q: He was walking side to side?

A: Yes.

Q: How was his eyes?

A: His eyes were looking like he was just – they were lazy, just like looking like he was really tired.

Q: How was his ability to talk at this time?

A: It wasn't. From that point – the last thing he said to me was when I asked him if he was okay. That was – that was the last thing he said to me. Everything from there on out wasn't a word he said.

Q: He had throw-up or he had vomit on the front of him; is that correct?

A: Yes.

Q: He came back and what happens where he comes in the room? Are you in the bunk or out of the bunk?

-10-

A: I'm in the bunk.

Q: All right. You're sitting up or talking to him or trying to talk to him?

A: I'm laying down and I see him come in and I could smell it. And I asked him like, I said, "Are you okay?" I'm like, "What happened?" And he doesn't say anything.

Q: Where does he go now?

A: He gets back on the bunk.

Q: Does he have to step on your bunk to get up there or does he – what happens?

A: He would usually would have to jump up but like now he had to step on my bunk to get up and he couldn't make it up. So that's when I went and I told the officers like something's wrong with him.

Q: So you leave the room now?

A: I leave the room. I break top lock. It really didn't matter because he needed some sort of assistance.

Q: So you leave your room and go where?

A: To the officer's station

Q: Down the hallway?

A: Down the hallway.

Q: In this diagram that we have drawn here it's the guard station; is that correct?

A: Guard station, yes.

Q: So you walked down to the guard station. Who do you talk to?

A: I talked to Officer Johnson and the other – if I – if I were to see him, I would – I could point him out easily. The face will never leave my mind. But it's the names I don't –

Q: Was he another white officer or a black officer?

A: I talked to a white and a black officer.

-11-

Q: They were on duty down there together?

A: Yes.

Q: So what do you say to these gentlemen?

A: I tell them that something's wrong with my bunkee. It's like he just threw up on himself in the bathroom and he can't make it up on his bunk.

Q: What do they say to you?

A: They told me – that's when they come down. They told me to switch bunks. They tell me to get on the top bunk and him to get on the bottom seeing he couldn't make it on the top bunk. So that's when – okay – he laid – he gets in my bunk and I get up on the top bunk.

Q: What happens after that?

A: He's still not able to sit still. And he rolls off the bunk and gets onto the floor. And I could see now he's shaking.

Q: When you say "he's shaking," what do you mean by that?

A: He was like – honestly, it looked like he was having a seizure or something.

Q: Was he shaking from the top of his head to the bottom of his toe or –

A: Shaking –

Q: – was his arms shaking, legs?

A: From the top of his head, bottom of his toe, arms, legs.

Q: So his whole body is shaking?

A: His whole body was shaking

Q: What type of position was he in?

A: He's in like curled up in the fetal position.

Q: All right. And he's now laying on the floor?

A: On the floor.

Q: How is he dressed now?

A: He's dressed – he had his shorts on.  He has the – or the state shorts, the orange shorts and a tee shirt.

Q: And this is where the throw-up is on?

A: The throw-up was on the tee shirt.

Q: And what happens then?

A: He throws up again, on the floor.

Q: Okay.

A: And so this is when I go upstairs and I go tell the officers like he just – my bunkee just threw up.

Q: Now, this is another time you leave.

A: Excuse me?

Q: How many times – is this the first time or the second time?

A: It's the first – it's the third time.

Q: How many times do you go tell the guards that night?

A: I tell them about four, five times.

Q: You're sure of that?

A: That – I'm sure of that, like four or five times on different occasions with different things that happened from like when he vomited to when – actually, when he vomited, when I went and told them, they told – they really just gave me a bucket and a – because the porter closet, they gave me a bucket and a rag and told me to go clean it up.

. . .

Q: Is he still in this fetal position?

A: He's still in a fetal position. He gets sort of – he doesn't just get on the floor. This time he gets on the floor and rolls under the bunk. So I go upstairs and I tell them again something's wrong. And so they come down. They come down this time and help me get him up and get him on the bunk.

Q: Is that the same two officers you had talked to earlier?

A: The same two officers I talked to earlier. Throughout this whole incident, it's the same two officers.

Q: So they come down – on the second occasion you go down there, you help put him back up.

A: Help put him back on the bunk.

Q: How long does he stay on the bunk or whatever at that point in time?

A: Not long. I'd say about two minutes.

Q: What happens then?

A: He gets back on the floor again and starts shaking. And this time I could tell that he had – I'm seeing he had urinated on himself because it was on the bunk, it was on the bed and you could see it on his pants. So I went upstairs and told them like he just – in the exact words, "he just pissed on himself." So they were like, "Well, maybe he wants to be on the floor." So I'm looking. I'm like, "You can't send him to health services or anything?" And they tell me that they don't have any health services at night. This is well after 8:00 o'clock. This is like –

Q: It's now after 12:00 o'clock, isn't it?

A: Now after 12:00 o'clock; yes.

Q: So you tell them now that he has urinated on himself.

A: Yes. That's how he need –

Q: Pissed on himself.

A: Yes.

Q: What do they do then? Do they come back to the room?

A: No.

Q: What do they say to you? "Smith" –

A: Tell me maybe he wants to be on the floor.

Q: So that's it?

A: Yes.

Q: Did they tell you to go back to the room?

A: No, but I – so I went back to the room.

Q: All right.

. . .

A: Yeah. And no – and the shaking has slowed down some but I still knew something was wrong because I could see it in his eyes. Like his eyes were looking like lazy now, like they were rolling back and I mean they would roll. They were just like –

. . .

Q: What time do you go down for the new shift change?

A: I go down there approximately 6:00 o'clock because that's what time the shift change at.

Q: And what do you say to those people at that time?

A: I let them know what's going on with my bunkee. I tell them like he's on the floor. I'm not even sure if he's alive.

Q: What do they respond to you?

A: They'll get health services.

Q: They'll get health services?

A: Yes. And they never came.

Earl Smith Dep. at 26-38.

Despite Smith's last statement, the evidence shows that health services did come at around 7:40 a.m., and LaFayette was taken to the hospital. The question presented, however, is whether Smith's several trips to the guard station and the defendant's observations of LaFayette through the night amount to a sufficiently "strong showing on the objective component" that creates a jury question on the defendants' subjective state of mind. The Court believes it does not.

There is no evidence that anyone knew that LaFayette was suffering from a critical illness. He had no history of seizure disorder, pneumonia, or encephalopathy. He was diagnosed as having the flu earlier that night when he went to health services. He was scheduled to see health care services in the morning. Captain Foy had consulted with Duane Waters Hospital at approximately 2:09 a.m. and accurately relayed LaFayette's condition; he was not told to have him transported to hospital immediately.

Nor is there any evidence that LaFayette was suffering from "classic" symptoms of any critical disease. As mentioned, he did exhibit "flu-like" symptoms, which would have explained his dizziness, shivering, and vomiting. There is no question that LaFayette was very sick, but the evidence does not support in inference that waiting until health care services opened in the morning to seek medical attention for him amounted to deliberate indifference to his serious medical needs. Rather, the Court believes that the facts of this case track more closely to those in *Miller*, where the inmate suffered a relatively sudden onset of central nervous system symptoms. He complained of a headache one evening, and by the following morning he had deteriorated to the point that he was transported to hospital by ambulance, where he died later that day of a brain tumor. The court found that the decedent's condition was not so obvious that a fact finder could infer a culpable state of mind on the part of the prison guards. Even though the decedent's condition progressively spiraled

downward through the night, and the guard did not convey all the information to the consulting physician, the court concluded that the apparent negligence did not constitute a constitutional violation. So it is here as well.

Dequon LaFayette's death is lamentable, and perhaps it was avoidable, although that latter observation is not at all clear from the record. Nonetheless, the Court agrees with the magistrate judge that the plaintiff has not demonstrated that the death resulted from the defendants' deliberate indifference to the young man's serious medical needs. The undisputed facts suggest otherwise, and when viewed in the light most favorable to the plaintiff, they compel judgment for the defendants as a matter of law on the plaintiff's federal claim. The state law claims will be dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

### III.

The Court agrees with the findings and conclusions of the magistrate judge.

Accordingly, it is **ORDERED** that the Magistrate Judge's Report and Recommendation [dkt # 33] is **ADOPTED**.

It is further **ORDERED** that the plaintiff's objections are **OVERRULED**.

It is further **ORDERED** that the defendants' motion for summary judgment [dkt # 16] is **GRANTED**.

It is further **ORDERED** that count one of the complaint alleging a claim under 42 U.S.C. § 1983 is **DISMISSED WITH PREJUDICE**, and the balance of the complaint is **DISMISSED WITHOUT PREJUDICE**.

Dated: April 27, 2006                              s/David M. Lawson
                                                   DAVID M. LAWSON
                                                   United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 27, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS